444 So.2d 1279 (1984)
G/O ENTERPRISES, INC., Lawrence Carr, and Glenda Petroleum Company
v.
MID LOUISIANA GAS COMPANY.
No. CA-0898.
Court of Appeal of Louisiana, Fourth Circuit.
January 5, 1984.
Writ Denied March 9, 1984.
John M. McCollam, Sheryl L. Hopkins, Gordon, Arata, McCollam & Stuart, New Orleans, La., for plaintiffs-appellants.
William R. Pitts, Anne E. Tate, Liskow & Lewis, New Orleans, La., for defendant-appellee.
Before BARRY, CIACCIO and WILLIAMS, JJ.
WILLIAMS, Judge.
This is a case involving the interpretation of an amendment to a gas purchase contract drawn between plaintiff, G/O Enterprises, Inc., and defendant, Mid Louisiana Gas Company. Plaintiff contended that the amended contract contained an indefinite escalator clause which entitled it to the maximum price for natural gas permitted by the most recently issued Federal Power Commission opinion, and brought a claim *1280 for additional amounts due. Defendant contended that the contract adopted the FPC price in effect at the time of the amendment and maintained that price. The trial court held that the language of the contract as amended clearly and unambiguously supported defendant's interpretation and granted judgment in favor of defendant, dismissing plaintiff's claims for additional sums due. Plaintiff has appealed. We affirm.
The well which is the subject of this gas purchase contract was spudded and completed as an oil well in 1939, and first produced natural gas in 1955. The gas was first sold for resale in February, 1972, pursuant to a temporary contract between the owner, Lynco Petroleum Company, and Mid Louisiana Gas Company. In November, 1972, Lynco sold the well to G/O Enterprises, Inc. and in November, 1973, G/O as seller and operator entered into the present contract with buyer Mid Louisiana. Ernest Eldred of G/O and Vernon Woods of Mid Louisiana drew up the contract.
In December, 1973, Eldred filed a petition with the Federal Power Commission [FPC] for a disclaimer of jurisdiction and for a "small producer" certificate approving the sale. The FPC eventually denied the small producer certification and held that the sale of natural gas under G/O's and Mid Louisiana's contract was not a sale in interstate commerce and was not subject to the FPC's jurisdiction.
In early 1976, the well began overproducing salt water. Vacuum trucks were used to dispose of the excess salt water. Neighbors objected to the noise created by the salt water disposal operations, as the well's location was adjacent to a housing subdivision. Faced with threatened injunctive action and the prohibitive cost of the vacuum disposal, G/O shut down the well in April, 1976.
On June 3, 1976, Eldred discussed the problem in a telephone call to Woods, informing him that it would cost $20,000.00 to convert an adjacent oil well into a salt water disposal well so that production in the well subject of the G/O-Mid Louisiana contract could resume. On the same day, he wrote Woods a letter proposing two options for justifying the costs of the well conversion:
1. Mid Louisiana could increase the price on the gas to the maximum amount allowable under the FPC for gas produced after 1974 (even though we recognize that the FPC has no jurisdiction over this gas). All of the risks would be on G/O and its partners as to whether the well would pay out.
2. Mid Louisiana could advance the cost of the salt water disposal well with a payback out of the net proceeds (operating costs deducted).
On June 22, 1976, Woods wrote to Eldred stating, "[i]n reply to your letter of June 3, 1976, Mid Louisiana is agreeable to increasing the price on the gas. I will draw up an amendment to the contract and forward it to you in the near future." Woods drafted an amendment to the gas purchase contract and forwarded it to Eldred on June 23, 1976. Whether the parties communicated during the interval between Woods' receipt of Eldred's letter of the 3rd and Woods' letter of the 22nd and the amendment draft following is a matter in dispute between the parties.
The amendment was executed by Eldred without change on July 16, 1976, and returned to Woods, the parties having agreed upon an effective date of July 1, 1976. The amendment reads, in pertinent part:
WHEREAS, as an inducement to Seller to complete and place in operation a well for the disposal of the salt water, Buyer has agreed to increase the price payable under said agreement;
NOW, THEREFORE, in consideration of the premises, the parties hereto amend said agreement dated November 28, 1973, as follows:
1. Paragraphs (1) and (2) of Article VIII, "Price," are deleted in their entirety and the following is substituted in place thereof:
"(1) Buyer agrees to pay Seller for each MCF of gas delivered or for which payment is due hereunder, the maximum just and reasonable rate which *1281 the Federal Power Commission, or other governmental agency having jurisdiction over gas sold for resale in interstate commerce, shall permit to be charged by small producers for gas of the same quality and character as that sold hereunder; provided, that such price shall not be higher than the amount per MCF which the Federal Power Commission, or other governmental agency having jurisdiction over Buyer's rates, shall permit Buyer to include in its costs and charge to its customers as a part of its rates. Any increased price or prices payable hereunder, over and above the initial price provided below, shall be prospective only and effective from and after the date Buyer shall have had the opportunity to make effective an increase in its rates to its customers in order to collect from them such increased price or prices.
"(2) The parties acknowledge that in Opinion No. 742, issued August 8, 1975 in Docket No. R-393, the Federal Power Commission prescribed as the just and reasonable rate applicable to sales by small producers a rate equal to 130% of the Commission-determined base ceiling rate applicable to gas of the quality and character sold, which rate is subject to adjustment for the Btu content of the gas, for tax reimbursement, and for a gathering allowance where applicable. The parties further acknowledge that in Opinion No. 699-H, issued December 4, 1974 in Docket No. R-389-B, the Commission fixed a base ceiling rate applicable to gas not previously sold in interstate commerce prior to January 1, 1973 of 50 cents per MCF at 14.73 psia (51.00 cents per MCF at 15.025 psia), plus severance tax as actually paid, subject to adjustment for Btu content above or below, 1000 Btu's per cubic foot at 60 F. and 14,73 psia, and an annual escalation beginning January 1, 1975 of 1 cent per MCF at 14.73 psia (1.02 cents per MCF at 15.025 psia). The Commission also authorized an upward adjustment of the price by an allowance for gathering. Accordingly, it is agreed that, for gas delivered on or after the date hereof, the initial price payable hereunder shall be 68.95 cents per MCF at 15.025 psia (130% × 53.04), [... plus tax reimbursement of 7.0 cents per MCF (at 15.025 psia), which amount shall be adjusted for Btu content of the delivered gas, and to which shall be added an allowance for gathering of 0.51 cents per MCF (at 15.025 psia), for a total price, based on the assumed average Btu content of the delivered gas of 998 Btu's per cubic foot, of 76.31 cents per MCF (at 15.025 psia).] It is further agreed that payment of this price, and of any future charged price, is conditioned upon the further actions of the Federal Power Commission or other agency or reviewing court, both in fixing rates for small producers and in allowing Buyer to pass the price on to its customers; and that, accordingly, the above price will be adjusted to reflect any subsequent changes in either, and that the Seller will refund to Buyer any amounts paid by Buyer which are in excess of the per MCF cost of this gas which Buyer is allowed by the Federal Power Commission (or other agency or court) to pass on to its customers, together with interest from the date of payment by Buyer at an annual rate equal to that which is required by the Federal Power Commission, or other agency having jurisdiction, to pay on refunds to its customers. This refund will be due at the time of issuance of any such decision and may, at the option of Buyer, be recovered from 50 percent of the payments thereafter due for gas sold hereunder." (disputed portions underlined).
From the time of this amendment forward, Mid Louisiana monthly paid G/O at the rate set by FPC opinion 699-H, with the escalations provided for in the opinion. Although Eldred continually telephoned Mid Louisiana regarding periodical transfers of a few hundred dollars at a time to be taken from escrow and paid to G/O, G/O did not demand increased payment under the gas purchase contract until May 29, 1979, when John M. McCollam wrote Woods demanding $392,422.31 as payment past due since the issuance on July 27, 1976 of FPC opinion 770 which set forth a higher *1282 price for gas than 699-H. On cross-examination, Eldred agreed that despite the fact that G/O was getting 75 cents per MCF and he knew of a regulation requiring Mid Louisiana to pay $1.42 per MCF, he decided not to request the increase from Mid Louisiana before the May 29 letter "because it was probably too big a battle to take them on," adding that "[i]t would be an economic problem for one thing." When Mid Louisiana refused to make the increased payments as demanded, G/O brought the present suit.
Mid Louisiana transmits natural gas by interstate pipeline. Thus, although its purchase of gas from G/O constitutes an intrastate transaction, it is regulated by the FPC as a seller of gas in interstate commerce to distributors for resale to the public. At the times pertinent to this proceeding Mid Louisiana was required to obtain a certificate of public convenience and necessity from the Commission before executing a sale. The Commission's regulations permit Mid Louisiana to pass through to customers only rates it deems prudently incurred.
Opinion 699-H set forth a rate of 50 cents per thousand cubic feet of gas with annual escalations of 1 cent per MCF (and several other adjustments not pertinent here) for sales of natural gas in interstate commerce for resale when "made pursuant to contracts for the sale of natural gas in interstate commerce for gas not previously sold in interstate commerce prior to January 1, 1973...." F.P.C. Op. 699-H, 256a(2)(ii). Because it was agreed that the parties' transactions were to be considered in interstate commerce for pricing purposes as of July 1, 1976, they fit under this category.
Opinion 742, issued August 28, 1975, permitted a "small producer" to be paid "130 percent of the Commission-determined base ceiling rate applicable to a comparable large producer sale." The parties agreed that G/O would receive this additional payment.
On July 27, 1976, Opinion 770, then amended by 770-A, was issued, providing that "(1) Sales of natural gas in interstate commerce for resale may be made at a rate of $1.42 per MCF ... provided: (i) The sale is made from a well commenced on or after January 1, 1973, and prior to January 1, 1975." Op. 256a(1)(i). These maximums were of course only permissive, the verb may being used throughout the text. Opinion 770 as amended by 770-A did not affect rates established in 699-H for "gas not previously sold in interstate commerce prior to January 1, 1973," and these continued in effect.
The Natural Gas Policy Act of 1978 extended Commission jurisdiction, as of December 1, 1978, to intrastate producer sales, like that between G/O and Mid Louisiana. The Act established a new maximum lawful price which no intrastate contract could exceed, and provided that contractual escalator clauses could have the effect of increasing prices to the latest maximum. This escalation would not be applied in all cases; rather, due respect would be given the parties' intent to contract prices below the statutory maximum: Section 2701.101(b) provides, "[i]f the price established under a contract for the first sale of natural gas does not exceed the applicable maximum lawful price, then such maximum lawful price does not supersede or nullify the effectiveness of the price established under such contract."
After passage of the NGPA in December, 1978, Eldred telephoned Woods claiming G/O was entitled to the maximum lawful price set out in the new Act. Woods informed Eldred that Mid Louisiana would continue paying the price it had paid in the past, pointing out that the 699-H rate had been continued in the NGPA and that the Act was not to escalate contracted rates to the NGPA maximum unless specific contractual authority was found to justify the Commission control. Eldred admitted that he did not at that time mention a claim under Opinion 770.
Eldred then made a written demand for the NGPA maximum price, again omitting any mention of the Opinion that had become effective July 27, 1976. In a letter of April 13, 1979, Eldred wrote about the disputed *1283 NGPA claim: "I am turning this matter over to our attorney, John McCollam, in preparation of filing suit to determine whether you are correct in your interpretation or we are correct in our interpretation." The letter continued with G/O's first allusion to a claim under Opinion 770: "It also appears that we have a claim retroactive back to the time which the FPC allowed the biannual price to escalate." In a letter of May 29, 1979, Mr. McCollam made the first specific demand on Mid Louisiana for the Opinion 770 rate (see supra). Suit was filed September 25, 1979, and on January 18, 1982, the Civil District Court for the Parish of Orleans rendered judgment in favor of defendant. In his Reasons for Judgment, Judge Garvey stated:
"Considering all of the evidence and documents filed, the Court finds that the contract language is clear and unambiguous.
This is a contract entered into between knowledgeable people in the oil and gas field, holding themselves out as specialists.
If the contract words can be interpreted as clear and unambiguous, they should be enforced as such."
Plaintiff specifies the following errors on appeal: (1) the Court was in error in finding that the language of the Amended Contract was clear and unambiguous and was in accord with defendant's interpretation of the Amended Contract rather than plaintiff's; (2) if the express language of the Amended Contract is not in accord with plaintiff's interpretation of it, the language is ambiguous and the Court was in error in not considering parol evidence, which clearly supports plaintiff's interpretation of the Amended Contract; (3) alternatively, if the express language of the Amended Contract is not in accord with plaintiff's interpretation of it, then the Amended Contract does not express the mutual intent of the parties to the contract and should be reformed to reflect that intent; and (4) the Court was in error in stating in its Reasons for Judgment that both parties to the Amended Contract were specialists and thus equally knowledgeable in the area covered by the Amended Contract.
The motive for the Amended Contract was the raising of a sum of money sufficient to fund a salt water disposal well so that the natural gas well subject of the parties' contract could resume functioning. The contractual amendment clearly set out this motive, the text beginning, "WHEREAS, as an inducement to Seller to complete and place in operation a well for the disposal of the salt water, Buyer has agreed to increase the price payable under said agreement...." The cost of the salt water disposal well was estimated at $20,000.00. Mid Louisiana, as an interstate seller of gas, was subject to FPC jurisdiction which restricted its freedom to set its gas purchase prices. The agreed-upon increase, therefore, had to be great enough to cover the costs of the disposal well, but small enough so that the FPC would consider the increase prudently incurred and permit Mid Louisiana to pass it through to its customers. In the face of these considerations, the parties decided that Mid Louisiana would facilitate G/O's building and operating the disposal well by raising the price it paid G/O to the Federal Power Commission's "maximum just and reasonable rate... for gas of the same quality and character as that sold hereunder." The Amendment cited Opinion 699-H and stated, "[a]ccordingly, it is agreed that, for gas delivered on or after the date hereof, the initial price payable hereunder shall be 68.95 cents per MCF ...", the 699-H price with the 130% small producer adjustment that the parties adopted. The initial price was to undergo an annual 1 cent escalation as provided for in 699-H. The parties were well aware that their intrastate contract was not subject to FPC price regulations, but agreed to adopt the higher FPC price nonetheless in order to effectuate the object of their contractthe financing of a disposal well which would permit production from the natural gas well to resume.
The parties devoted many pages of their briefs to the meaning of the contractual language "maximum just and reasonable *1284 rate" and "for gas of the same quality and character as that sold hereunder."
The "maximum just and reasonable rate" is a term of art for the natural gas price ceiling federally promulgated after proceedings investigating various factors before fixing a rate in the public interest. Plaintiff asserts that it is entitled to the most current "maximum just and reasonable rate" as set forth in FPC Opinion 770. It asserts that the Opinion 699-H price is set out in the contract as merely the initial price, and has now been replaced by the later Opinion 770 rate. Plaintiff contends that the words "quality" and "character" are synonymous as utilized in the contract, both referring to physical properties identifying the gas. Article X of the parties' original 1973 contract defined the physical specifications coming under the word "quality." Plaintiff asserts that the word "character" was included in the amendment's language to cover physical properties not listed in that provision outlining quality specifications. Thus, plaintiff claims a right to the "maximum just and reasonable rate" set forth in the most recently issued FPC opinion for gas of the same physical characteristics as the gas under contract.
Defendant contends that the word "quality" covers the physical properties of the gas, and that "character" refers to the spud date of the well or the date the gas was introduced into interstate commerce and incorporates the rate applicable to that date. Defendant points out that the only applicable physical property that was not covered under Article X's quality specifications was delivery pressure, so that under plaintiff's interpretation the word "character" would serve as no more than the equivalent of "delivery pressure." It is defendant's position that equating the word "character" with time elements is the more intelligible resolution, "vintaging" the gas to the date of its fictional introduction into interstate commerceJuly 1, 1976, the effective date of the contractual amendment. Thus, the "character" of the gas is the fact of its having come under FPC jurisdiction on July 1, 1976 so that its "maximum just and reasonable rate" was established under the latest Opinion in effect on that date 699-H. Defendant suggests that it would be absurd to outline Opinion 699-H in such detail in the contractual amendment if it were not the price set for the gas, but rather just a starting rate to be modified by the next opinion issued by the FPC. It should be noted also that the contractual amendment does not state that "the initial price payable hereunder shall be the Opinion 699-H rate," inferring, as plaintiff contends, that that initial opinion may thereafter be superceded. The amendment outlines Opinion 699-H, stating the price per MCF and elaborating on various price adjustments, including an annual escalation, and then agrees that "the initial price payable hereunder shall be 68.95 cents per MCF ..." The use of the word "initial," defendant asserts, recognizes the fact that the Opinion does provide for changes in the price paid for gas, escalations which defendant observed in paying plaintiff the 699-H price over the years.
G/O highlighted four cases in support of its argument that the amended contract contains an indefinite escalator clause requiring Mid Louisiana to pay G/O the maximum FPC rate. In all of these cases, the court determined that the maximum price set forth in Opinion 770 was due, rather than one of the lower rates approved in that opinion for earlier-spudded wells.
In Kerr-McGee Corp. v. Northern Utilities, Inc., 673 F.2d 323 (10th Cir.1982), the trial court rendered judgment nullifying contractual language escalating the parties' gas rate to the NGPA ceiling, reasoning that that high rate was unconscionable and against public policy. The Tenth Circuit, reversing and holding the contractual language adopting the maximum FPC rate to be valid, was merely affirming the validity of the NGPA's pricing system and assuring that the statutory maximum did not vioalte public policy. In the instant case, the validity of relevant statutory maximums has been accepted without question. Rather, the issue is whether the parties intended to contract at a price below that permissible maximum.
In Amoco Production v. Stauffer Chemical, Etc., 612 P.2d 463 (Wyo.1980), the *1285 court considered that the policy of a mostfavored nations clause mandated the adoption of the highest rate set in Opinion 770. In adopting a most-favored nations clause, the parties in Amoco had indicated their paramount interest in maintaining their gas pricing at a level competitive with the most highly paid of the purchaser's other customers. The G/O Mid Louisiana contract did not contain such a clause. The paramount consideration of the G/O contract amendment was, as expressed in the preamble, the financing of the salt water disposal well.
Amoco Production Co. v. Kansas Power & Light Co., 505 F.Supp. 628 (D.Kan.1980), and Superior Oil Co. v. Western Slope Gas Co., 604 F.2d 1281 (10th Cir.1979) both concerned most-favored nations clauses, immediately making the argument for maximum pricing stronger than in the case at hand. Further supporting the adoption of the maximum prices was the fact that both purchasers at some point acted contradictorily to an intent not to pay the maximum as it escalated. In Amoco v. Kansas Power & Light, supra, the purchaser filed a rate application with the state commission for authorization to pass on increased costs to be incurred when the higher Opinion 770 price was paid. Only later did it withdraw its application and assert that its price was not subject to any increase. In Superior Oil, supra, the purchaser increased its price with the publication of Opinion 699-H, but refused to increase payments following the issuance of the next Opinion, 770. Unlike these examples, at no time did G/O behave as if Mid Louisiana was compelled to pay the maximum. Mid Louisiana consistently paid the 699-H price with applicable increases, and G/O did not dissent.
Legal agreements have the effect of law upon the parties and courts are bound to give them legal effect according to the true intent of the parties. La.Civ.Code art. 1945; Louisiana Nat'l Leasing Corp. v. A.D.F. Serv., Inc., 377 So.2d 92 (La.1979). Even within the confines of the FPC's federal pricing regulation, the parties' freedom to contract has been jealously guarded. The United States Supreme Court explained in U.S. Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956):
In construing the [Natural Gas] Act, we should bear in mind that it evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring contracts to be filed with the Commission, the Act expressly recognizes that rates to particular customers may be set by individual contracts ... Recognizing the need these circumstances create for individualized arrangements between natural gas companies and distributors, the Natural Gas Act permits the relations between the parties to be established initially by contract, the protection of the public interest being afforded by supervision of the individual contracts which to that end must be filed with the Commission and made public. [76 S.Ct. at p. 378].
* * * * * *
Our conclusion that the Natural Gas Act does not empower natural gas companies unilaterally to change their contracts fully promotes the purposes of the Act. By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry. [76 S.Ct. at p. 380].
The Natural Gas Policy Act of 1978, which extended FPC jurisdiction to intrastate producer sales expressed the same respect for the parties' freedom to contract in Section 2701.101(b) [text supra].
The intent of the parties becomes indisputable upon reviewing the actions they took while subject to their contract. Mid Louisiana monthly paid the Opinion 699-H price for an extended period of time, during which the FPC issued Opinion 770 introducing a higher maximum just and reasonable rate, with no complaint from G/O. Only after consulting an attorney over the separate issue of potential Natural Gas Policy Act increases did G/O begin to make any claim to the higher rate of Opinion 770, by then nearly three years old. It is difficult to imagine that G/O could have believed itself contractually entitled to the higher *1286 rate and yet, despite continued contact with Mid Louisiana over matters involving only a few hundred dollars, could have done absolutely nothing to request the higher FPC rate until, almost three years after the Opinion's issuance, it made its initial demand for $392,422.31 in payments past due. It is equally difficult to imagine Mid Louisiana, subject to FPC price restraints for resale of purchased gas, negotiating an amendment to permit G/O's financing of a $20,000.00 disposal well that three years later would cost Mid Louisiana not $20,000.00, but twenty times that sumand would continue to rise with each FPC opinion raising the maximum rate for natural gas sales.
The trial court weighed the evidence and evaluated the credibility of the witnesses and concluded that the contract clearly and unambiguously provided that the parties had contracted to adopt the rate of FPC Opinion 699-H and not, as the plaintiff had asserted, the current maximum rate as issued in the most recent FPC Opinion. This factual determination cannot be disturbed absent a showing of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We find no such showing here. The judge considered all of the evidence and documents filed before holding the contract clear and unambiguous. After considering the same evidence and documents, we find no showing of manifest error, and affirm the trial court judgment.
Plaintiff asserts that the trial court erred in not holding the contract ambiguous in order to consider parol evidence in the form of oral testimony and letters written by the parties to the contract. Plaintiff asserts that the letters of June 3 and June 22, 1976, see supra, constituted an offer and acceptance resulting in a contract adopting the FPC maximum which agreement the contract once drawn up, reflected. Woods's brief written reply that "Mid Louisiana is agreeable to increasing the price on the gas" is more easily considered a pre-acceptance communication culminating in a draft of an amendment which Mid Louisiana presented as an offer to G/O and which G/O accepted, than as a formal "acceptance" of an "offer" couched in G/O's outline of "a couple of ways in which we could justify the costs (of the disposal well)." In any case, because the court specifically did consider such evidence in its holding, and we have affirmed that holding, this argument is dismissed.
Since the contract has been held to express the mutual intention of the parties, plaintiff's demand for a reformation of the contract is also dismissed.
As to plaintiff's fourth claim, the trial judge noted that this was a contract between knowledgeablehe did not say "equally knowledgeable"people in the oil and gas field. The court noted that they both held themselves out as specialistsit did not say they were specialists. G/O tendered Eldred to the court as an expert and the court qualified him as suchclearly then, the court was not in error in stating that he held himself out as a specialist.
For the foregoing reasons, the trial court judgment is AFFIRMED.
AFFIRMED.