524 So.2d 1305 (1988)
CONOCO, INC., Plaintiff-Appellant,
v.
TENNECO, INC., Acting By and Through its Division, TENNESSEE GAS PIPELINE COMPANY, Defendant-Appellee.
No. 87-155.
Court of Appeal of Louisiana, Third Circuit.
March 9, 1988.
Writ Denied May 13, 1988.
*1306 Marjorie W. Doyle, Houston, Tex. and Liskow & Lewis, Lawrence P. Simon, Lafayette and George Domas, New Orleans, for plaintiff-appellant.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lawrence E. Donohoe, Jr., Edward C. Abell, Robert K. Reeves, John Bernard, Lafayette, for defendant-appellee.
Before FORET and DOUCET, JJ., and SWIFT[*], J. Pro Tem.
*1307 FORET, Judge.
Plaintiff, CONOCO, INC. (Conoco) filed suit against TENNECO, INC. (Tenneco) for recovery of money allegedly due in connection with a Gas Purchase and Sales Agreement entered into by said parties. The trial court rendered judgment in favor of Tenneco and Conoco has perfected this appeal.
On August 28, 1979, Conoco and Tenneco entered into a Gas Purchase and Sales Agreement pursuant to which Conoco sold to Tenneco one-half of the natural gas reserves attributable to Conoco's interest in certain offshore acreage designated as Eugene Island Block 257. Section 8(c)[1] of the contract states that the price for gas sold and delivered by Conoco shall be adjusted in accordance with any ceiling prices subsequently approved by the Federal Energy Regulatory Commission (FERC) effective as of the date such price is made effective by FERC.[2]
After the contract was entered into, Conoco filed an application for a certificate of public convenience and necessity with FERC, requesting permission to collect, in connection with the aforesaid contract, the NGPA Section 109 price. FERC issued a temporary certificate on October 18, 1979, authorizing the sale of natural gas from Conoco to Tenneco but limiting the price to the lower NGPA Section 104 price. The certificate was made effective as of the effective date of initial deliveries under the contract, i.e., January 1, 1980. Thereafter, on January 31, 1980, FERC issued a permanent certificate, establishing the same price limitation and effective date as the temporary certificate previously issued. The FERC approved Sec. 104 price became the contract price pursuant to Sec. 8(c) of the contract, and Conoco billed Tenneco at such rate for all gas sold and delivered from January 1, 1980 onward. The Sec. 104 price remained in effect until FERC amended its certificate on January 19, 1984, increasing the ceiling price to the maximum lawful price prescribed by NPGA Sec. 109(b). The certificate further provided that such increase was effective as of the effective date of the original certificate, i.e., January 1, 1980. Accordingly, commencing with the invoice of March 19, 1984, Cities Service Oil Company (Cities Service), Conoco's representative under the terms of the subject contract, began billing Tenneco for current deliveries of gas at the higher Section 109 price, and these bills were paid by Tenneco in accordance with the contract. On July 10, 1984, Cities Service invoiced Tenneco, on behalf of Conoco, for $17,884,163.56, representing the difference between the Sec. 104 price and the Sec. 109 price from the date of initial deliveries under the contract to March 19, 1984. On August 13, 1984, Tenneco forwarded to Cities Service a check in the amount of $3,867,335.88, representing the price difference between the NGPA Sec. 104 price and the Sec. 109 price for gas delivered to Tenneco from July 13, 1982 to January 31, 1984, being the twenty-four-month period immediately preceding Tenneco's receipt of the aforesaid invoice for arrearages due. Thereafter, by letter dated October 18, 1984, Conoco made demand on Tenneco for payment of the remaining principal balance of $14,016,827.68, being the difference between the Sec. 104 price and the Sec. 109 price for the period beginning January 1, 1980 and ending July 12, 1982. By letter dated January 4, 1984, Tenneco reaffirmed its earlier position, refusing to pay the remaining balance claimed by Conoco, and this litigation ensued. Tenneco bases its refusal to pay on a provision contained under Section III-A (hereinafter sometimes referred to as the Billings and Payments Section) of the subject contract and does not dispute the correctness of the principal amount claimed by Conoco.
*1308 The pertinent provisions of the subject contract appear at Section 8(c) and Section III-A(1)(2) and (3).
"(c) Should Congress, the President or other executive authorities, the Federal Energy Regulatory Commission, or any other governmental authority, administrative agency or otherwise, having jurisdiction, prescribe or permit, by any action of government, whether by statute, order, settlement, rulemaking proceeding, policy statement, regulation, or otherwise, a price applicable to the sale of all or part of the gas delivered hereunder, or a price generally applicable to other gas in the same area, which is higher than the price otherwise provided herein, then the price to be paid by Buyer to Seller for such portion of the gas delivered hereunder which would otherwise qualify for such higher price shall be increased, effective as of the effective date of such higher price, to equal such higher rate including permitted adjustments.

SECTION III-A

BILLINGS AND PAYMENTS
1. On or before the 15th day of each month after deliveries of gas are commenced, Seller shall render Buyer a statement for the preceding month showing the volume of gas delivered hereunder, or the volume Buyer was obligated to take or pay for hereunder, the amount due therefor and information sufficient to explain and support any adjustment in volumes made by Seller in determining the amount billed.
2. Buyer will pay Seller on or before the 25th day of each month, or as to invoices rendered after the 15th day of each month, within ten (10) days after receipt of such invoices, for gas delivered during the preceding month, according to the measurements, computations, and prices herein provided. If the correct amount is not paid when due, interest on any unpaid amount shall accrue at the rate of nine percent (9%) per annum. If such default continues sixty (60) days after written notice from Seller to Buyer, Seller may suspend gas deliveries hereunder without prejudice to other remedies.
3. If any overcharge or undercharge in any form whatsoever shall at any time be found and the bill therefor has been paid, Seller shall refund the amount of any overcharge received by Seller, and Buyer shall pay the amount of any undercharge within thirty (30) days after final determination thereof; provided, however, no retroactive adjustment will be made for any overcharge or undercharge beyond a period of twenty-four (24) months from the date the discrepancy occurred." (Emphasis ours.)
The issue presented for our consideration on appeal is whether or not the trial court erred in finding that Conoco was not entitled to recover, pursuant to the contract in question, the difference between the NGPA Sec. 104 price and the Sec. 109 price for the period beginning January 1, 1980 and ending July 12, 1982.
Section IX-A(3) of the contract states that it is to be construed in accordance with the law of the State of Texas. Where the parties have stipulated upon the state law governing their contract, such law will be applied by the courts of our State unless it is shown that to do so would violate strong public policy considerations. Fine v. Property Damage Appraisers, Inc., 393 F.Supp. 1304 (E.D.La.1975); Davis v. Humble Oil & Refining Co., 283 So.2d 783 (La.App. 1 Cir.1973). However, our courts shall presume that the law of such other state is the same as the law of our State unless we are provided with statutory and jurisprudential authority to the contrary. Johnson v. Nationwide Life Insurance Co., 388 So.2d 464 (La.App. 2 Cir. 1980). In the instant case, both parties have provided this Court with ample statutory and jurisprudential law from the State of Texas, and accordingly, we are bound to apply the law of the State of Texas in this case as there is no showing that doing so would violate any strong public policy considerations in Louisiana.
*1309 As the trial court correctly noted, the applicable Texas law on contracts is substantially similar to that of Louisiana. In Texas, the contract is the law between the parties. Pratt v. Story, 530 S.W.2d 325 (Tex.Civ.App.1975). A contract should be interpreted in such a way as to effectuate the intent of the parties. Ogden v. Dickinson State Bank, 662 S.W.2d 330 (Tex. 1984). A contract is to be read and interpreted in its entirety and its provisions are to be considered together and in light of one another. Southland Royalty Co. v. Pan American Petroleum Corp., 378 S.W. 2d 50 (Tex.1964). Also, when a contract admits of two constructions, it will be strictly construed against the party who drafted the agreement. Republic National Bank v. Northwest National Bank, 578 S.W.2d 109 (Tex.1978). Texas has adopted the uniform commercial code on contracts. Of particular importance here is Sec. 2.202 of the Texas Business and Commerce Code which states as follows:
"§ 2.202. Final Written Expression: Parol or Extrinsic Evidence
Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
(1) by course of dealing or usage of trade (Section 1.205) or by course of performance (Section 2.208); and
(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."
Tenneco contends, and the trial court so found, that Section III-A(3) of the contract is applicable to the facts of this case and that this provision limits Conoco's right to adjust undercharges to the twenty-four-month period immediately preceding Tenneco's receipt of Conoco's invoice setting forth the full amount of arrearages due. Tenneco correctly states that the amended FERC certificate dated January 19, 1984 increased the ceiling price for gas sold by Conoco to the NGPA Sec. 109 price and that such increase was made effective as of the effective date of the original certificate. Thus, according to Tenneco, the Sec. 109 price must be deemed to have been the price authorized by the contract from January 1, 1980 onward, the same as if the original FERC certificate had provided for the NGPA Sec. 109 price. Tenneco contends that it necessarily follows that all monthly charges based on the lower Sec. 104 price were "undercharges" that occurred as of the date of each such invoice or charge. In other words, Tenneco maintains that the FERC order of January 19, 1984, retroactively converted each invoice previously sent on behalf of Conoco to an "undercharge", even though these invoices were correct at the time of billing. Thus, once it is determined that the invoices did, in fact, contain undercharges, Sec. III-A(3) of the contract becomes applicable, and Conoco is therefore prohibited from adjusting any undercharges "beyond a period of twenty-four (24) months from the date the discrepancy occurred." Tenneco asserts that the discrepancies must have occurred at the time of the undercharge, which, according to Tenneco, is the date of each such charge or invoice. Tenneco then concludes by saying that, according to Section III-A(3), Conoco can only adjust those undercharges or discrepancies occurring within twenty-four months of the date on which Tenneco received Conoco's bill for arrearages due. Tenneco states that by its own terms, Sec. III-A(3) applies to undercharges "in any form whatsoever" and that this necessarily includes adjustments created by subsequent FERC certificates.
While Tenneco's argument is ingenious and worthy of thoughtful consideration, we reject it for the reasons that follow.

OVERALL PURPOSE AND FUNCTION OF CONTRACTUAL PROVISIONS AT ISSUE
As noted earlier, in interpreting a provision in a contract, the court should consider the contract as a whole. Steeger v. Beard *1310 Drilling, Inc., 371 S.W.2d 684 (Tex.1963), Southland Royalty Co. v. Pan American Petroleum Corp., supra. When one considers the subject contract in its entirety, it becomes abundantly clear that the Billings and Payments Section of the contract, of which Sec. III-A(3) is a part, is a secondary provision which derives information regarding price from other portions of the contract and, in particular, the pricing provisions contained under Sec. 8. Sub-paragraphs (1), (2), (3) and (4) of the Billings and Payments Section must be read in pari materiae. When one does so, the scope and meaning of each of these subsections is easily discerned. Subsections (1), (2) and (3) are accounting provisions intended to provide the proper procedure for billing and for dealing with incorrect or erroneous bills. As such, these provisions focus on contemporary or month-to-month invoices and the correctness thereof. Stated another way, these provision concern themselves with the accuracy of monthly billings as of the time such bills are issued. The purpose of Sec. III-A(3) is to allow for the adjustment of invoices which were incorrect, or in error, at the time such invoices were sent. Where, as in our case, the invoices were accurate at the time they were sent out, the Billings and Payments Section of the contract is completely inapplicable. On the other hand, Sec. 8(c) of the contract clearly states, without limitation, that the price for gas sold shall be increased in accordance with subsequent FERC certificates and it provides that such increase shall be effective, "as of the effective date of such higher price." Accordingly, this clause, contained under the pricing section of the agreement, is an express authorization for the collection of the NGPA Sec. 109 price from whatever date such price is made effective by FERC, without any limitation whatsoever. Thus, in summation, we find that Sec. 8 of the contract establishes the price and the effective date of such price while the Billings and Payment Section is in the nature of an accounting provision and, as such, is desiged to insure proper billing and accounting procedures with limited opportunity for adjustment of erroneous invoices. Stated another way, Section 8 of the contract establishes the price, and the Billings and Payments Section, including Subsection 3 thereof, provides the procedure for the billing and collection of such price. To interpret this agreement in any other way would clearly subvert the underlying purpose and meaning thereof.

INVOICES IN QUESTION DO NOT CONSTITUTE "UNDERCHARGES"
In holding that Sec. III-A(3) of the contract is not applicable in this case, we specifically reject Tenneco's contention that the FERC order of January 19, 1984 somehow converted prior invoices, which were correct when sent out, to undercharges. As Conoco correctly points out in its brief, each monthly invoice submitted by Conoco during the time period in dispute, correctly set forth the highest price that Conoco was allowed to charge according to the contract and its current FERC certificate. Because each invoice was correct at the time it was sent out, there was no "undercharge" and thus Section III-A(3) of the contract is wholly inapplicable. The fact that FERC subsequently amended its certificate to provide for a higher price does not alter the fact that the invoices in question were correct at the time they were sent to Tenneco and were therefore not undercharges.
The determination as to whether or not an invoice constitutes an undercharge or overcharge can only be made at the time the invoice is sent out. What was not an error at the time of billing cannot be converted to an erroneous billing by subsequent FERC certificates which, as the record will reflect, do nothing more than increase or decrease the maximum allowable price and stipulate the effective date thereof. Clearly, if, on the date Conoco mailed out the invoices in question, it could only charge the NGPA Sec. 104 price, such invoices, which reflect such price, cannot be considered as undercharges. Accordingly, if there existed no undercharges at the time the invoices in question were sent out, Section III-A(3) of the contract will not apply. Tenneco's argument, that the FERC order of January 19, 1984 retroactively *1311 converted the invoices to undercharges, fails to consider the fact that there is indeed a difference between being effective as of a certain date and being in effect on that date. This distinction lies at the very heart of this case. The fact that the January 19, 1984 FERC order made the NGPA Sec. 109 price effective as of January 1, 1980, does not mean that such price was, in fact, in effect on such date. The fact is, it was not. From January 1, 1980 through July 12, 1982, the period in dispute, the NGPA Sec. 104 price was the maximum lawful price allowed by FERC and the contract and as such, all invoices which were based on such price were not undercharges. A billing is not an "undercharge" if it was correct at the time it was made. Tenneco does not dispute that the billings made prior to 1984 were correct as of the date of the billings.

TENNECO'S INTERPRETATIONCONFLICT BETWEEN PROVISIONS OF CONTRACT
Tenneco's interpretation of the subject agreement inevitably causes the pertinent contractual provisions to conflict in two significant respects. Firstly, Tenneco's interpretation of Sec. III-A(3) results in a direct conflict between this provision and Sec. 8(c) of the contract. Specifically, the interpretation advanced by Tenneco would have Sec. III-A(3) prohibit what the pricing section of the contract and in particular Sec. 8(c), expressly permitsadjustments in price in accordance with FERC certificates, effective as of the effective date of such certificates. Secondly, Tenneco's appreciation of the scope and meaning of Sec. III-A(3) negates a primary purpose and function of Subsections (1) and (2) contained in the Billings and Payments Section of the contract. In fact, the interpretation placed on Sec. III-A(3) by Tenneco effectively penalizes Conoco for having complied with Subsection (1) of the Billings and Payments Section which was clearly drafted to ensure accurate and proper billing procedure. In this case, Conoco did bill Tenneco for the correct amount during the period in question. In other words, these invoices were correct at the time they were sent out. However, because Conoco did so and thereby complied with Subsection (1) of the Billings and Payments Section, they would be prohibited from adjusting such charges under Tenneco's interpretation of the pertinent contractual provisions. Furthermore, had Conoco erroneously billed Tenneco at the higher NGPA Sec. 109 price during the period in question, Conoco would now be allowed to collect the entire amount in dispute if one adopts Tenneco's interpretation of these provisions. Conoco would be permitted to do so, even though the invoices were incorrect and in violation of III-A(1), because there would have been no undercharge and thus the twenty-four-month time limitation set forth under Sec. III-A(3) would not be applicable. Thus, Tenneco's interpretation of Sec. III-A(3) results in a second direct conflict in two or more provisions of the contract. This conflict results from the fact that, in some instances, Conoco would be penalized under Sec. III-A(3) for having complied with Subsection (1) contained under the Billings and Payments Section and in other instances be rewarded for having failed to do so. Thus, Tenneco's interpretation of the subject contract, which will inevitably lead to unjust and unreasonable results, is rejected.

DATE DISCREPANCY AROSE
Even if Sec. III-A(3) of the contract were applicable to the facts of this case, it is clear that Tenneco's claim for adjustment does fall within the twenty-four-month time limitation set forth therein. Section III-A(3) states that the twenty-four-month period commences "from the date the discrepancy occurred." Because Conoco could not collect the NGPA Sec. 109 price until the FERC order of January 19, 1984, no discrepancy could have occurred until the date of such order, at the earliest. As noted in our earlier discussion, the invoices sent out during the period in dispute were not undercharges and thus, no discrepancy could have occurred on the dates these invoices were prepared and sent out. Conoco therefore had twenty-four months from January 19, 1984, to adjust these discrepancies and Conoco has clearly done so. *1312 Tenneco contends that the discrepancies must be deemed to have occurred on the dates of the invoices or charges. This would mean that the discrepancies would have occurred prior to the date of the event which caused the discrepancies, i.e., the FERC order of January 19, 1984. Moreover, such an interpretation would have the effect of retroactively creating discrepancies which are instantly too old to correct. We do not find merit to Tenneco's contention in this regard.

MANIFEST ERROR RULE DOES NOT APPLY
Tenneco contends that the trial court's holding cannot be overturned unless manifest error is shown. As authority for its position, Tenneco cites G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d 1279 (La.App. 4 Cir.1984), writ denied, 446 So.2d 318 (La.1984), and Ayers v. Kent, 438 So.2d 691 (La.App. 2 Cir.1983). These cases are clearly distinguishable from the instant case and Tenneco's argument as to the applicability of the manifest error rule is without merit. In each of the above cited cases, the appellate court held that where factual findings are pertinent to the interpretation of a contract, these factual findings are not to be disturbed unless manifest error is shown. We agree. However, our interpretation of the contract in question is not premised upon any factual findings made at the trial level but is, instead, based upon our review and examination of the contract itself. Surely, the trial court is in no better position than this Court to review and interpret a contract and, for this reason, the manifest error rule does not apply.

RECOVERY OF INTEREST AND ATTORNEY'S FEES
Section III-A(2) of the contract states that interest shall accrue on any past, due amounts at the rate of 9% per annum. Neither party has briefed this Court as to the legality of such rate of interest in the State of Texas, and we shall therefore assume that Texas law is no different from Louisiana law insofar as this issue is concerned. See Johnson v. Nationwide Life Ins. Co., supra. For contracts of this nature, 9% is a legal rate of interest in the State of Louisiana. See La.C.C. art. 2924. Section III-A(2) of the subject contract stipulates that payment shall be due on or before the 25th day of the month provided such invoice is rendered on or before the 15th day of the month. The invoice in question was received by Tenneco on July 13, 1984 and therefore payment was due on or before July 25, 1984. Accordingly, interest shall accrue at the rate of 9% per annum from July 26, 1984, which is the date the invoice in question became past due.
As for the issue of attorney's fees, Conoco is not entitled to recover same. We shall also apply Louisiana law with regard to this issue in view of the fact that neither party has briefed this Court as to the applicable Texas law.[3] In Louisiana, attorney's fees are only recoverable when authorized by statute or contract. Morvant v. Arnoult, 490 So.2d 549 (La.App. 4 Cir.1986). The contract in question does not provide for attorney's fees and there is no statutory authority in Louisiana for recovery of attorney fees in this case. Accordingly, Conoco's claim for attorney's fees is denied.

CONCLUSION
In summation, we find that the Billings and Payments Section of the contract does not apply to a price adjustment resulting from FERC approved rate increases. Simply stated, the pricing provisions of the *1313 contract contained under Section 8 and, in particular Subsection (c) thereof, control. We do not feel that an accounting provision such as Section III-A(3) of the subject contract can be applied in such a way as to defeat Conoco's right to collect gas prices specifically authorized by Section 8 of the contract.
Considering the above, the judgment of the trial court in favor of Tenneco, Inc. is reversed and,
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, CONOCO, INC. and against defendant, TENNECO, INC. in the sum of FOURTEEN MILLION, SIXTEEN THOUSAND, EIGHT HUNDRED TWENTY-SEVEN AND 68/100 ($14,016,827.68) DOLLARS, together with interest thereon at the rate of 9% per annum from July 26, 1984.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs, both at the trial level and on appeal, are assessed to defendant-appellee, TENNECO, INC.
REVERSED AND RENDERED.
NOTES
[*] Judge William Swift, Jr., Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] It appears that Section 8(a) of the subject contract is also applicable to the facts of this case.
[2] The Federal Energy Regulatory Commission is a federal administrative body. The FERC establishes the maximum allowable price for the sale of natural gas and is also charged with the administration and enforcement of certain federal statutes such as the Natural Gas Act and the Natural Gas Policy Act (NGPA).
[3] Section IX-A(3) of the subject contract states that, "this Agreement shall be construed according to the law of the State of Texas." The contract does not make any provision for attorney's fees, and therefore the issue of attorney's fees does not involve a construction of the contract. It is not known whether or not the law of the State of Texas would otherwise be applicable according to established conflicts of laws principles adopted in the State of Louisiana. In any event, this Court has not been provided with authority from any of our sister states with regard to the issue of attorney's fees and we shall therefore apply the laws of the State of Louisiana as noted above.