982 So.2d 934 (2008)
LAURA'S PRODUCTS, INC.
v.
600 CONTI STREET, LLC and William B. Alexander.
No. 2007-CA-0819.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 2008.
*935 Robert H. Matthews, Pauline M. Warriner, New Orleans, LA, for Plaintiff/Appellee.
Phillip A. Wittmann, Lesli D. Harris, John Mark Fezio, Stone Pigman Walther Wittmann L.L.C., New Orleans, LA, for Defendants/Appellants.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge EDWIN A. LOMBARD, Judge ROLAND L. BELSOME).
PATRICIA RIVET MURRAY, Judge.
Defendants, William Alexander and 600 Conti Street, LLC, appeal the trial court's judgment finding they breached the lease agreement between them and the plaintiff/ lessee, Laura's Products, Inc., and awarding damages. For the reasons that follow, we affirm.
FACTS AND PROCEEDINGS BELOW
In May, 1997, Laura's Products, Inc. [hereinafter "Laura's"], executed a lease with H & M Realty Company for commercial space located on the first floor of 602-604 Conti Street, a building constructed in the 1800's in the New Orleans French Quarter. Albert Mintz, whose family owned the building, executed the lease documents on behalf of H & M Realty Company. Laura's, which at the time was owned by spouses John and Cheryl Dutton, *936 is a retail business that makes and sells candy. In 1999, the parties extended the lease, which was set to expire in 2000, until May 31, 2005. Laura's operated its business in that building, which is on the corner of Conti and Chartres Streets, until late April of 2001. Around that time, Mr. Mintz noticed that the exterior brick wall on the Conti Street side of the building was bowed out. He engaged a structural engineer, William Mouton, to examine the building. Mr. Mouton concluded that, due to the bowing out of the load-bearing wall, the building was in danger of immediate collapse. He reported his conclusion to Albert Mintz, who called Laura's on April 23, 2001 and informed the store manager that because of the dangerous condition of the building, Laura's personnel should vacate the building immediately. After calling Mr. and Mrs. Dutton to let them know what was happening, the store manager closed down Laura's and vacated the building.
With all the tenants evacuated from the building,[1] Mr. Mintz hired Mr. Mouton to supervise the temporary stabilization of the building and to give him an estimate on the cost of permanent repairs. Mr. Mouton ultimately recommended that Mr. Mintz reconstruct the exterior Conti wall at a cost of approximately $700,000. Rather than pursue the extensive reconstruction, Mr. Mintz decided to sell the building. On June 22, 2001, Mr. Mintz's company sold the building to 600 Conti Street, LLC, an entity owned by William Alexander. In the act of sale, Mr. Alexander expressly assumed all the obligations of Mr. Mintz as lessor under the lease agreement with Laura's. On June 25, 2001, Mr. Mintz sent a letter to John and Cheryl Dutton informing them of the sale of the building and of the fact that Mr. Alexander had assumed all of Mr. Mintz's responsibilities pertaining to the lease. Mr. Mintz further stated that Mr. Alexander had assured him that he would help John and Cheryl Dutton reestablish their business at that location.
Mr. Alexander hired an architect, Barry Fox, to assess the building, develop a plan for repair, and supervise the project. Structural repair work began on or about August 21, 2001. On September 18, 2001, Jackie McPherson, attorney for 600 Conti, LLC, sent John and Cheryl Dutton a letter notifying Laura's that their lease was cancelled by its own terms because the premises were wholly unfit for occupancy and could not be repaired within 120 days.
In October, 2003, Laura's filed the instant action against Mr. Alexander and 600 Conti Street, LLC, alleging defendants' breach of the lease agreement had caused them to suffer damages including loss of profits and expenses related to the relocation of their candy business to a less desirable location. The matter was tried before a jury on February 5-13, 2007. The jury returned a unanimous verdict in favor of Laura's, answering six specific interrogatories as follows:
(1) At the time plaintiffs were asked to leave in April, 2001, the building at 600 Conti Street was not wholly unfit for occupancy because of an event covered by lines 147 to 152 of the lease [the so-called "Fire or Casualty Clause"];
(2) The plaintiffs did not waive the implied warranty of fitness of the leased premises;
(3) The defendants breached the lease with Laura's by canceling it;

*937 (4) The defendants breached the implied warranty of fitness of the leased premises;
(5) As a result of defendants' actions, the plaintiffs suffered damages in the amount of $250,000.
On February 16, 2007, the trial court rendered a written judgment in accordance with the jury's verdict. Defendants now appeal that judgment.
ISSUES
Defendants argue that the trial court erred in three respects: (1) by failing to find that the plaintiffs waived the implied warranty of fitness as to the leased premises; (2) by failing to find that the defendants were entitled to cancel the lease under lines 147-152 (the "Fire or Casualty" provision); and alternatively, (3) by finding that plaintiffs suffered damages in the amount of $250,000 as a result of the defendants' breach of the lease. Answering the appeal, the plaintiffs raise an additional issue: that the trial court erred by failing to exclude the testimony of defendant's expert on damages, Harold Asher. According to plaintiffs' argument, if Mr. Asher's testimony had been excluded, the jury would have awarded double the amount of damages ($532,113). We address each issue in turn.
WAIVER OF IMPLIED WARRANTY OF FITNESS
At the time the lease between the plaintiffs and H & M was executed (and at the time the plaintiffs were evacuated from the building), Louisiana Civil Code article 2695 provided that every lessor warranted to the lessee that the thing leased was suitable for its intended purpose.[2] However, this implied warranty could be waived in the lease contract to the extent that the lessee agreed to assume liability for the condition of the leased premises. See La. Rev. Stat Ann. § 9:3221 (2001); Tassin v. Slidell Mini-Storage, 396 So.2d 1261, 1264 (La.1981).[3] In the instant case, lines 63-67 of the original lease state:
Lessee assumes responsibility for the condition of the premises and Lessor will not be responsible for damage caused by leaks in the roof, by bursting of pipes by freezing or otherwise, or by any vices or defects of the leased property or the consequences thereof, except in the case of positive neglect or failure to take action toward the remedying of such defects within reasonable time after having received written notice from Lessee of such defects and the damage caused thereby.
In addition, the rider to the lease states, in Paragraph 14:
Lessee accepts the leased premises in the condition the leased premises shall be at the time of delivery of occupancy without any repairs, replacements or improvements from or to be made by Lessor. During the term of this lease, as may be extended, Lessee will be responsible for and pay for all expenses and costs in connection with the repair, maintenance, replacement and improvement of the leased premises, excluding the roof. Lessee shall be responsible for any pay for all remodeling (whether same to be interior and/or exterior structural or otherwise or whether same be ordinary or extraordinary) required or necessary on or to the leased premises *938 concerning the first floor only. Lessee is not responsible for any damages on second and third floors, provided such damages are not caused by Lessee, its officers, directors, stockholders, employees, agents, customers or invitees.
The defendants contend that by signing the lease containing these clauses, the Dutton's waived the implied warranty of fitness of the leased premises. They also contend that the trial court committed legal error by submitting the issue of waiver to the jury rather than concluding as a mater of law that the terms of the contract constituted a waiver by the lessee. Citing Conoco, Inc. v. Tenneco, Inc. By and Through Tennessee Gas Pipeline Co., 524 So.2d 1305 (La.App. 3d Cir.1988), the defendants assert that due to the trial court's legal error, this court should not give any deference to the jury's findings, but rather, should employ a de novo standard of review We disagree. The court in Conoco held that, where its interpretation of the contract in question was not premised upon any factual findings made at the trial court level, but was, instead, based solely upon the court's examination of the contract itself, the manifest error standard did not apply. 524 So.2d at 1312. The instant case is clearly distinguishable from Conoco, as in this case the jury made factual determinations regarding whether the condition of the building that precipitated the cancellation of the lease fell within the ambit of responsibilities the plaintiffs assumed in the so-called waiver provisions. When, as here, factual findings of the trial court are pertinent to the interpretation of a contract, those findings may not be disturbed absent manifest error. See, e.g.: G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d 1279 (La.App. 4th Cir.1984).
Alternatively, the defendants contend that the jury's finding that plaintiffs did not waive the implied warranty of fitness is manifestly erroneous. In support of this contention, defendants cite two prior decisions of this court in which we held that exactly the same waiver provision found in lines 63-67 of this lease "clearly and unambiguously transferred liability to the plaintiff [tenant] for the condition of the premises" and for vices or defects in the leased property. Ford v. Bienvenu, 00-2376, p. 11 (La.App. 4 Cir. 8/29/01), 804 So.2d 64, 71; Muse v. Katz, 93-1066 (La. App 4 Cir. 2/11/94), 632 So.2d 846, 847-48. Both Ford and Muse involved fires that destroyed the leased premises. In Ford, the fire began in the lessee's condominium unit, was confined to that unit, and, according to the evidence, was probably caused by a faulty circuit breaker box in the hall closet of the unit. 804 So.2d at 66. This court affirmed the trial court's finding that by signing the waiver provision in the lease, the tenant had assumed liability for any defects in the leased premises and had thereby waived the implied warranty of fitness owed by the landlord. However, Ford is distinguishable from the instant case because in Ford, the defect was within the leased premises. In the instant case, the defect was a bowing out of the exterior wall of the building between the first and second floors. The evidence showed that the defective condition was probably caused by a gradual shifting of the building over many years, until it reached a point at which, due to the instability of the joists holding up the second floor, there was a danger of the second and third floors collapsing onto the first. The Dutton's leased only the first floor. Although they assumed responsibility for the condition of the leased premises, the lease specifically prohibited them from doing anything to the exterior of the building except for placing a sign outside their business. Therefore, the jury reasonably could have found that the defect occurred *939 outside the leased premises and therefore was not subject to the waiver.
Muse v. Katz, the second case upon which defendants rely, does not actually support their position, but rather suggests that if the defect is not within the leased premises, the waiver does not apply. In Muse, this court reversed the granting of the landlord's motion for summary judgment, partially on the basis that the question of whether the shed in which the fire had started was located in the backyard of the plaintiff/ tenant's apartment or in the backyard of an adjacent apartment was a genuine issue of fact that precluded summary judgment. 632 So.2d at 850. See also: Barnes v. Riverwood Apartments Partnership, 38,331 (La.App. 2 Cir. 4/7/04), 870 So.2d 490, wherein the court held that by signing the waiver provision of the lease, the plaintiff/ tenant did not contractually assume liability for defects in the common areas of an apartment complex, but only for those in his own unit.
Considering the evidence presented in the instant case, we do not find the jury's determination that the plaintiffs did not waive the implied warranty of fitness to be unreasonable or manifestly erroneous.
APPLICABILITY OF THE "FIRE OR CASUALTY" CLAUSE
Defendants next contend that the jury committed manifest error by determining that the first floor of the building was not wholly unfit for occupancy in April, 2001, because of an event covered by lines 147-152 of the lease. That provision, also known as the "Fire or Casualty" Clause, states:
If, through no fault, design or neglect of Lessee, the premises are destroyed by fire or other casualty or damaged to such an extent to render them wholly unfit for occupancy, then this lease shall be cancelled. If, however, the premises can be repaired within 120 days from the date of the fire or casualty, then this lease shall not be cancelled, and Lessor shall notify Lessee within thirty days from the date of fire or casualty that Lessor will repair the damage, and Lessee shall be entitled only to such a reduction or remission of rent as shall be just and proportionate.
Defendants specifically relied upon this language in the August, 2001 letter by which Ms. McPherson informed the Duttons that Laura's lease was cancelled by its own terms.
On appeal, defendants first argue that the jury was manifestly erroneous in its determination that the leased premises were not totally unfit for occupancy for a period of more than 120 days. However, we note that the jury did not make such a determination. Rather, the jury found that the premises were not totally unfit for occupancy because of an event covered by lines 147-152 of the lease. The jury was not required to specify the basis for this finding, which could have been either that the building was not unfit for occupancy, or that the building was unfit for occupancy but not because of an event covered by the "Fire or Casualty" Clause. Under the manifest error standard of review, we cannot disturb the jury's finding unless we conclude that there is no reasonable basis for it in view of the totality of the evidence. See Stobart v. State through Dept of Transp. & Development, 617 So.2d 880, 882 (La.1993). In the instant case, the evidence was undisputed that the bowing-out of the exterior wall of the building was not caused by a single event, but instead was the result of gradual degradation, subsidence and shifting of the building over many years. Defendants argue that the lease cancellation provision is not limited to instances of fire or casualty, but instead includes any situation in which the leased premises are damaged to such an extent as *940 to render them totally unfit for occupancy. Defendants' argument is premised upon the use of the disjunctive "or" in the phrase "destroyed by fire or other casualty or damaged to such an extent to render them totally unfit for occupancy" in the first sentence of the provision. While defendants' interpretation seems reasonable, we note that the second and final sentence of the provision seems to assume the existence of a fire or "other casualty." Moreover, defendants have not cited, nor have we found, any Louisiana jurisprudence in which this very common lease cancellation provision was applied to the slow degradation of a building, or indeed, to any situation that did not involve a fire or other specific damage-causing event that could be termed a casualty.
Therefore, we find that the applicability of the "Fire or Casualty" Clause to the instant situation is debatable. Our conclusion comports with that of the trial judge, who, in denying defendants' motion for directed verdict, found that the meaning of the clause was a subject upon which "reasonable minds might differ." Moreover, as we find it reasonable for the jury to have concluded that the lease was not cancelled by its own terms because the condition of the building was not due to a fire or other casualty, we cannot say the jury's finding of liability on the part of the defendants was clearly wrong or manifestly erroneous. Therefore we affirm that finding.
DAMAGES
The jury determined that plaintiffs suffered damages in the amount of $250,000. On appeal, defendants argue that this amount should be reduced to zero because according to the testimony of their expert, Harold Asher, Laura's was not a profitable business. Conversely, plaintiffs assert that Mr. Asher's testimony should have been excluded by the trial court, and the damage award therefore should be raised to $532,113, the amount of lost profits determined by their expert, David Bassemier.
We first address the plaintiffs' contention that Mr. Asher's testimony should have been excluded because his methodology failed to meet the standard for acceptance of expert testimony set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). During trial, plaintiffs' counsel moved for a Daubert hearing to determine whether Mr. Asher should be disqualified from testifying. The trial judge denied the motion on the dual bases that the motion was untimely and that the plaintiffs' objections to Mr. Asher's methodology, even if proved valid, would not disqualify Mr. Asher from testifying, but rather would affect the weight to be given his testimony by the jury.
A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. Radlein v. Holiday Inns, Inc., 07-0322, p. 7 (La.App. 4 Cir. 11/14/07), 971 So.2d 1200, 1205. We find no abuse of discretion in the trial court's decision to accept Mr. Asher as an expert. Mr. Asher testified that he was both a certified public accountant and a forensic C.P.A., and that he had testified as an expert in the calculation of lost profits in Louisiana state courts and in other jurisdictions many times over the past thirty years. The trial court did not err by refusing to conduct a Daubert hearing.
Alternatively, the plaintiffs argue that the jury should have discredited Mr. Asher's testimony because he utilized an improper methodology in determining that Laura's did not lose any profits on account of the inability to operate the Conti Street store for the remainder of the lease term. *941 Specifically, plaintiffs contend that Mr. Asher improperly included depreciation in his calculation of lost profits. Plaintiffs therefore argue that Mr. Asher's testimony should have been discounted entirely in favor of the testimony of their C.P.A., Mr. Bassemier.
Conversely, defendants argue that Mr. Bassemier's testimony should be disregarded because his methodology was erroneous. Specifically, defendants contend Mr. Bassemier erred by failing to allocate costs between the Conti and Royal Street locations, by failing to account for the salary of Laura's owner/ manager, and by assuming that Laura's sales at the Conti Street location would have increased in correlation with the increase in tourists visiting New Orleans.
The same challenges raised on appeal were presented to the jury during the cross examination of each expert's testimony. It is the function of the jury to evaluate and weigh the testimony of each expert. In the instant case, the amount of damages determined by the jury was less than the figure suggested by the plaintiffs' expert but more than that espoused by the defendants' expert. Under the circumstances, we cannot say that the jury's determination of lost profits in the amount of $250,000 was unreasonable or manifestly erroneous in light of the evidence in the record. Accordingly, we decline to disturb the jury's finding.
CONCLUSION
For the reasons stated, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] In addition to Laura's, there were several residential tenants on the second and third floors who also vacated the building.
[2] The principle stated in former La. C.C. art. 2695 is restated in article 2696 of the 2004 Revision of the Louisiana Civil Code.
[3] La. C.C. art. 2699, which became effective Jan. 1, 2005, now provides that the warranty may be waived, "but only by clear and unambiguous language that is brought to the attention of the lessee."